**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ARNULFO MALDONADO, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-06-3124 |
| | § | |
| JO ANNE BARNHART,[1] | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 3). Cross-motions for summary judgment have been filed by Plaintiff Arnulfo Maldonado ("Plaintiff," "Maldonado") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Supporting Brief ["Plaintiff's Motion"], Docket Entry # 13); (Defendant's Cross-Motion for Summary Judgment, Docket Entry # 10); (Defendant's Brief in Support of Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #11). Both parties have responded in opposition to the motions for summary judgment. (Plaintiff's Response to Defendant's Cross Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry # 16); (Defendant's Response Brief In Opposition To Plaintiff's Motion For Summary Judgment And Supporting Brief ["Defendant's Response"], Docket Entry # 14). After considering the pleadings, the evidence

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. As provided in Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is automatically substituted for Jo Anne B. Barnhart as the defendant in this action. *See* 42 U.S.C. § 405(g); *see also ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1340 (5th Cir. 1981).

submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be DENIED and that Defendant's motion be GRANTED.

**Background**

On January 23, 2004, Plaintiff filed an application for Supplemental Security Income Benefits ("SSI") under "Title II and Part A of Title XVIII" of the Social Security Act ("the Act") due to a total hip replacement and "arthritis-rheumatism" in his hips, knee, shoulder and neck". (Transcript ["Tr."] at 64-67, 97).  In his application, Plaintiff claimed that he had been unable to work since March 6, 2003, because of his inability to "walk far, bend, lift weight, climb stairs and stay in one position for too long".  (Tr. at 97).  He stated that he "gets severe pain" when he performs those activities.  (*Id.*).  The SSA denied Plaintiff's application ruling that he is not disabled under the Act.  (Tr. at 41).   Plaintiff petitioned, unsuccessfully, for a reconsideration of that decision. (Tr. at 38).       On August 10, 2004, Plaintiff requested a hearing before an administrative law judge. ("ALJ").  (Tr. at 37).  That hearing, before ALJ Thomas G. Norman, took place on November 2, 2005. (Tr. at 27).  Plaintiff appeared with Marc Whitehead, an attorney, and he testified in his own behalf.  (*Id.*).  The ALJ also heard testimony from a vocational expert, Dr. Karen Nielsen, but no medical expert testified at the hearing.  (*Id.*).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.    An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

2

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995);  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Maldonado has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform othis work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve  months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Maldonado has "hypertension, status post right hip replacement, bilateral osteoarthritis of the knees, spinal stenosis, and obesity". (Tr. at 26).  Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.  (Tr. at 26).  The ALJ found further that Plaintiff has the residual functional capacity ("RFC") to perform a sedentary level of work activities.  (Tr. at 27).  He determined that Plaintiff had "no transferable skills from skilled work he previously performed", but that he could "perform a significant range of sedentary unskilled work".  (*Id.*).  For that reason, he concluded that Maldonado was "not under a 'disability,' as defined in the Social Security Act, at any time through

4

the date of this decision". (*Id.*).  The ALJ then denied his application for benefits on January 23, 2006.  (*Id.*).

On February 15, 2006, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 14).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  Plaintiff's counsel, Marc Whitehead, requested two extensions of time from the Appeals Council, to obtain a copy of the hearing tape, to supplement the medical records and to prepare the appeals brief. (Tr. at 10, 13).  The Appeals Council granted those extensions and "received additional evidence", which it made part of the record.  (Tr. at 7).  The additional evidence consisted of two exhibits designated as "Contentions, dated May 31, 2006, from the claimants' [sic] representative" and "Records from Green Oak Diagnostics dated April 25, 2006".  (Tr. at 7).  On July 27, 2006, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed.  (Tr. at 4).  With that ruling, the ALJ's findings became final, and, on October 3, 2006, George filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Complaint ["Complaint"], Docket Entry # 1).  Having considered the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED, and that Defendant's cross-motion be GRANTED.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id*. (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

In his motion, Plaintiff claims that he "ceased all work activities on March 6, 2003". (Plaintiff's Motion at 3). Maldonado asks this court to remand his application for benefits, because he claims the ALJ erred by finding that his impairments did not meet "the requirements of Listing

§ 102", in regard to "Major Dysfunction of a Joint". (*Id*. at 9). Maldonado also complains that the ALJ dismissed his "complaints regarding his joint pain and resulting instability and relied upon inconsistent and non-controlling evidence to support his finding that Plaintiff retained a sedentary RFC". (*Id*. at 11). Plaintiff argues further that, based on Medical-Vocational Rule 201.17, "a directed verdict of disabled" was proper. (*Id*. at 16). Finally, Plaintiff contends that the ALJ erred in his "finding that Plaintiff could perform the duties of a laminator, table worker, and assembly clerk". (Plaintiff's Response at 1). Defendant claims, however, that "[s]ubstantial evidence supports the ALJ's decision that Plaintiff can perform the "unskilled, sedentary work" identified by the vocational expert witness. (Defendant's Motion at 3). The Commissioner also argues that Plaintiff's impairments do not meet the requirements of "Listing 1.02A" and that the Medical-Vocational Rules are inapplicable to this case. (Defendant's Response at 2, 6).

### *Medical Facts, Opinions, and Diagnoses*

The earliest available evidence shows that, on December 12, 1995, Maldonado appeared at the St. Joseph Hospital for a "[r]ight primary total hip replacement", which was performed by Terry Clyburn, M.D. ("Dr. Clyburn"). (Tr. at 107). The notes detailing Plaintiff's medical history show that his "hip problems date back approximately fifteen years previously, when he sustained a severe, blunt trauma to his right leg and pelvis region". (Tr. at 109). Before the surgery he was diagnosed as suffering from "avascular necrosis" of the hip.[2] (Tr. at 107, 109). Dr. Clyburn listed Plaintiff's "condition on discharge" as "improved" and he prescribed Vicodin for pain. (Tr. at 107-108).

---

[2] "Avascular" means "(of a tissue area) not receiving a sufficient supply of blood". MOSBY'S at 156. ""Necrosis" is "localized tissue death that occurs in groups of cells in response to disease or injury". *Id*. at 1087.

The majority of the records, however, come from Plaintiff's physician at the Rheumatic Disease Clinic, Samuel B. Pegram, M.D., P.A. ("Dr. Pegram"). (Tr. at 115). From those records, it appears that Dr. Pegram treated Maldonado from 1997 to 2004. Plaintiff first appeared at the Rheumatic Disease Clinic of Houston ("the Clinic") on January 21, 1997. (Tr. at 156). During that visit, Plaintiff complained of pain in his left hip. (Tr. at 157). Dr. Pegram noted that Maldonado had a decreased range of motion in his left hip and possible "ankylosing spondylitis, with positive HLA-B27".[3] (Tr. at 156-57). He recommended a "[l]ocal glucocorticoid injection into the area of the left ischial bursa"[4] and prescribed pain medication and anti-inflammatory drugs. If Plaintiff did not respond to that regimen, Dr. Pegram suggested that an MRI scan would be appropriate to rule out "left lumbar radiculopathy"[5]. He told Plaintiff to return to the Clinic in two weeks. (Tr. at 156). Maldonado returned to the Clinic on January 31, 1997 and Dr. Pegram reported that his "left ischial

---

[3] "Ankylosing spondylitis" is "a chronic inflammatory disease of unknown origin, first affecting the spine and adjacent structures and commonly progressing to eventual fusion (anklyosis) of the involved joints . . . . In addition to the spine, the joints of the hip, shoulder, neck, ribs and jaw are often involved". MOSBY'S at 94-95.

"HLA" is an abbreviation for "human leukocyte antigen", which is "any one of four significant genetic markers identified as specific loci on chromosome 6: HLA-A, HLA-B, HLA-C, and HLA-D. Each locus has several genetically determined alleles; each of these is associated with certain diseases or conditions; for example, HLA B-27 is usually present in people who have anklosing spondylitis". Id. at 777.

[4] "Glucocorticoid" is an "adrenocortical steroid hormone that increases glyconeogenesis, exerts an antiinflammatory effect, and influences many body functions. The most important of the three glucocorticoids is cortisol (hydrocortisone) . . . Glucocorticoids promote the release of amino acids from muscle, mobilize fatty acids from fat stores, and increase the ability of skeletal muscles to maintain contractions and avoid fatigue". MOSBY'S at 697.

"Ischial" is derived from "ischium" which refers to "one of the three parts of the hip bone . . . [it] comprises the dorsal part of the hip bone". Id. at 876.

"Bursa" is "a fibrous sac between certain tendons and the bones beneath them". Id. at 240.

[5] "Lumbar" pertains to "the part of the body between the thorax and the pelvis". MOSBY'S at 960. "Radiculopathy" is "a disease involving a spinal nerve root". Id. at 1377.

bursitis [was] markedly improved". (Tr. at 154).   He recommended that Plaintiff continue taking his pain medication and anti-inflammatory drugs and ordered him to return in three months. (*Id.*). Plaintiff next appeared at the Clinic on April 4, 1997 and Dr. Pegram noted that Maldonado had a good range of motion in his hip, but that he had "osteoarthritis of the left knee".[6]  Dr. Pegram recommended that Plaintiff continue taking his anti-inflammatory medication and schedule another appointment in four months. (Tr. at 152).  At the next appointment, on August 8, 1997, Dr. Pegram recorded that Plaintiff was "doing well "post left total hip replacement".[7]  However, Dr. Pegram repeated Plaintiff's diagnosis of osteoarthritis in the left knee, and he recommended that Maldonado remain on the anti-inflammatory medicine and return in five to six months. (Tr. at 150).  During Plaintiff's next visit to the Clinic, on January 9, 1998, Dr. Pegram again noted that he had osteoarthritis, but he found that Maldonado had neck pain, as well. (Tr. at 148).   He prescribed a muscle relaxant for Plaintiff, in addition to his anti-inflammatory treatment. (*Id.*).  Six months later, Plaintiff returned to the Clinic, but the report from that visit is illegible. (Tr. at 146).  On August, 28, 1998, Maldonado again sought treatment from Dr. Pegram, and the doctor reported that Plaintiff had a decreased range of motion is his right hip. (Tr. at 145).  After that visit, Plaintiff reported to Dr. Pegram on December 18, 1998, April 30, 1999, October 29, 1999, and February 3, 2000. (Tr. at 141-44).  The reports from those visits are largely illegible, except those notations regarding Plaintiff's complaints of hip and knee pain. (*Id.*).  A record from the February 3, 2000 visit also

---

[6]  "Osteoarthritis" is "a noninflammatory  form of arthritis in which one or many joints undergo degenerative changes, including subchondral bony sclerosis, loss of articular cartilage, and proliferation of bone spurs (osteophytes) and cartilage in the joint". MOSBY'S at 1164.

[7]  The records show that Plaintiff only had his right hip replaced.

notes that Plaintiff has "Mult[i]-site" osteoarthritis.[8]  (Tr. at 140).  In June 2000, Plaintiff again visited the Clinic complaining of hip, knee and back pain.  Dr. Pegram noted that Maldonado had a good range of motion in his right hip, he prescribed anti-inflammatory medicine for him, and he recommended that Plaintiff return in three to four months.  (Tr. at 139).  Plaintiff did return on October 12, 2000, and at that time, Dr. Pegram reported that Celebrex had been "much help" in alleviating Maldonado's pain from arthritis.  (Tr. at 138).  Dr. Pegram found that Maldonado suffered from "mult[i]-site osteoarthritis", "joint effusion knee", and "spondylarthrosis".[9]  (Tr. at 137).  Dr. Pegram told Plaintiff to continue with Celebrex and to schedule another appointment with him in three to four months.  (Tr. at 138).  Plaintiff visited the Clinic again, on February 14, 2001, but he saw Ricardo Pocurull, M.D. ("Dr. Pocurull"), instead of Dr. Pegram on that day.  (Tr. at 132).  Dr. Pocurull noted that Plaintiff's pain was "under control", but that he "still complain[ed] of some neck stiffness and pain".   (Tr. at 132).   He diagnosed Plaintiff with neck pain and "[s]pondyloarthropathy" and recommended he take pain medication for his neck, Celebrex for his arthritis, have blood work done and return in three to four months.  (Tr. at 132).  Maldonado saw Dr. Pegram, on May 16, 2001, at which time Plaintiff complained of right knee pain, and he was told to continue the Celebrex and return in three to four months.  (Tr. at 136).  Three months later, Plaintiff again appeared at the Clinic.  (Tr. at 131).  At that visit, Maldonado complained of pain in his right knee and hip, but Dr. Pegram observed that Plaintiff exhibited a good range of motion in both.  (Tr. at 131).  Dr. Pegram again diagnosed Maldonado as suffering from  "spondyloarthopy"

---

[8]  That record is signed by Dr. Pegram, although it lists Plaintiff's "primary physician" as Dr. Clyburn, who performed Maldonado's right hip replacement.  (Tr. at 140).

[9]  "Effusion" is "the escape of fluid, for example, from blood vessels as a result of rupture or seepage, usually into a body cavity."  MOSBY'S at 537.

"Spondyloarthropathies" are "diseases of the joints and spine."  *Id*. at 1528.

10

and recommended he continue with Celebrex.  (*Id*.).  Plaintiff returned to the Clinic, on November 28, 2001, and he reported that his pain was "stable" except for occasional pain in his knee.  (Tr. at 130).  Dr. Pegram noted that he had neck pain, as well as joint and spine diseases, and he told Plaintiff to continue with Celebrex and a muscle relaxant.  (*Id*.).  The next record details Plaintiff's March 22, 2002 visit to the Clinic.  (Tr. at 129).  That report states the following:

> The patient complains of acute onset of pain localized [in] the right hip and right knee.  Patient has been quite active over the past 1 week.  Prior to that the patient was doing well with his current medical regimen.  Patient could not tolerate Ultram.[10]

(Tr. at 129).  Dr. Pegram recommended that Plaintiff take Celebrex and pain medication and that he schedule an appointment in three to four months.  (*Id*.).  Plaintiff next visited the Clinic on July 3, 2002 for a "follow up" because of his "spondyloarthropathy".  (Tr. at 127).  Maldonado complained of pain in his right hip that "is most pronounced when [he] arises [sic] from a seated position".  (*Id*.).  Dr. Pegram ordered an x-ray of Plaintiff's right hip and told him to return in three months.  (*Id*.).  On October 11, 2002, Maldonado again visited the Clinic and he reported that his hip x-rays were completed but that the results were pending and that he would bring in the films for review.  (Tr. at 126).  He claimed that his right hip pain had improved, but that he experienced "occasional popping of the right knee".  (*Id*.).  That record was signed by "Carol Manning, APRN, BC, FNP for Samuel Pegram, M.D."  The "impression" from that visit was that Plaintiff had "[o]steoarthritis" and a "[p]ossible loose right hip prosthesis".  (*Id*.).  Dr. Pegram next saw Plaintiff on January 10, 2003, when  Maldonado complained of "mild posterior neck pain", but his "[o]ther joints [were] stable".  (Tr. at 124).  Dr. Pegram reiterated his diagnoses of "spondyloarthropathy" and neck pain and he

---

10  "Ultram" is a "narcotic-like pain reliever" that is "used to treat moderate to severe pain". Available at: http:www.drugs.com/ultram.html (last visited Feb. 7, 2007); *see also Baez v. I.N.S.*, 2007 WL 24384311, at * 2 (5th Cir. Aug. 22, 2007).

prescribed muscle relaxants.  (*Id*.).  Plaintiff appeared at the Clinic again on April 11, 2003, and the

attending physician was Sreekanth Chintamaneni, M.D. ("Dr. Chintamaneni").  (Tr. at 123).

Maldonado complained of neck pain that had lasted for "several weeks" after he had exhausted his

supply of muscle relaxants.  (*Id*.).  He also reported that he had been "laid off" the previous month

after being with the company for twenty-seven years.  (*Id*.).  Dr. Chintamaneni advised Plaintiff that

he "need[ed] to have [his] renal function monitored".  (*Id*.).  Maldonado reported that he would have

the test completed the next month when he had new insurance.  (*Id*.).  Dr. Chintamaneni prescribed

Plaintiff more muscle relaxants and told him to return in three months.  (*Id*.).  On November 6, 2003,

Maldonado visited the Clinic because of the flu, and again Dr. Chintamaneni treated him.  (Tr. at

122).  The doctor's notes state that,

> [Plaintiff] ran out of [C]elebrex about 1 week ago and states [that his right] hip
> started hurting about 4 days ago. [He has had no] recent injury. [His] other parts are
> doing very well.  Patient remains unemployed.

(*Id*.).  Dr. Chintamaneni also observed that Plaintiff exhibited a good range of motion in his neck

and lumbar spine.  (*Id*.).  The doctor diagnosed him with "spondyloarthropathy" after testing positive

for "HLA B27".  Dr. Chintamaneni ordered X-rays of his right hip prosthesis and advised Plaintiff

"to do lab monitoring on [C]elebrex".  (*Id*.).  Plaintiff acknowledged that he was "overdue to get labs

done".  (*Id*.).  Dr. Chintamaneni told Maldonado to return in two months.  (*Id*.).  His last recorded

visit at the Clinic was on February 23, 2004, and on that day, he saw Dr. Pegram again.  (Tr. at 121).

Maldonado complained that he had pain in his right hip and knee, and that his left knee occasionally

"gave out".  (*Id*.).  He stated it was painful to move his shoulders, hips and knees and that he

sometimes experienced "dizzyness" because of his pain medication.  (*Id*.).

The record also includes the report of a consulting physician, Donald Gibson II, M.D., PA, which was dated March 29, 2004.  (Tr. at 158).  Based upon his examination of Plaintiff, Dr. Gibson made the following assessments:

> 1.  <u>Neck Pain</u>.  Mild.  With no radiculopathy or limitation of movement.
> 2.  <u>Status Post Right Hip Replacement</u>.  Stable.  Mild limitation of movement and slight antalgia.  Squat was 50% of normal.
> 3.  <u>Back Pain</u>.  Mild.  No limitation of movement, evidence of radiculopathy, or lower extremity neuropathy.
> 4.  <u>Shoulder Pain</u>.  Mild.  No limitation of movement or evidence of atrophy.  Grip strength is normal.  Patient had good fine and gross motor coordination.  He was able to sit, stand, and walk in the office setting without assistance.

(Tr. at 160).

On March 11, 2004, Plaintiff presented to a different state agency physician, Kelvin A. Samaratunga, M.D. ("Dr. Samartunga"), for a "Residual Functional Capacity Assessment".  (Tr. at 162).  Dr. Samaratunga listed Plaintiff's primary diagnosis as "neck pain" and his secondary diagnosis as "back  pain".  (*Id.*).  Dr. Samartunga reported that Plaintiff could lift fifty pounds occasionally and  twenty-five pounds frequently.  (Tr. at 163).  He noted that Maldonado could "stand and/or walk" and "sit" for "about 6 hours in an 8-hour workday", and that his ability to "push and/or pull" was "unlimited".  (*Id.*).  Dr. Samartunga also stated that Plaintiff could "frequently" climb, balance and stoop, and that he could "occasionally" kneel, crouch and crawl.  (Tr. at 164).  He found that Plaintiff had no "manipulative",[11] "visual", "communicative", or "environmental" limitations.  (Tr. at 165-66).  Finally, Dr. Samartunga concluded that Plaintiff's "alleged limitations exceed [the] objective findings".  (Tr. at 167).  He noted, however, that there were no "treating or

---

[11]   "Manipulative" limitations include those affecting "reaching [in] all directions", "handling", "fingering" and "feeling".  (Tr. at 165).

examining source statement(s) regarding the claimant's physical capacities in [the] file". (Tr. at

168). In his handwritten notes, Dr. Samartunga recorded the following:

> mild neck pain - no radiculopathy or restriction of movement . . .
> right hip replacement . . . status - mild limitation . . .
> Back pain [-] mild. - no limitation or restriction of movement.
> shoulder pain - mild
> FYI [-] Claimant was able to sit, stand, [and] walk in the office w/o assistance as per
> Dr. Donald Gibson

(Tr. at 169).

On October 5, 2004, Plaintiff first visited Jonathan G. Lee, M.D. ("Dr. Lee"), an orthopedic

surgeon. (Tr. at 193). Dr. Lee repeated Plaintiff's diagnosis of "ankylosing spondylitis" and noted

that he was "ambulatory . . . with [the] aid of a cane". (*Id*.). Dr. Lee ordered Plaintiff to use

"crutches for ambulatory assistance" and he restricted Maldonado "from work activities". (*Id*.).

Maldonado returned to Dr. Lee one month later. (Tr. at 193). During that visit, Dr. Lee noted that

Plaintiff "continues to have difficulty in bearing weight to the right low extremity" and that he had

spinal nerve pain which radiated down his right leg. (*Id*.). Dr. Lee encouraged Plaintiff to use

crutches "on a full time basis" and to return in two weeks. (*Id*). The next month, Plaintiff again

presented to Dr. Lee and "walk[ed] on a cane despite previous instruction to utilize crutches". (Tr.

at 192). Plaintiff reported that "[h]e is concerned about staying in bed while taking his pills in that

it makes him feel too relaxed". (*Id*.). Dr. Lee recommended that he use "crutches on a full time

basis" and he permitted Plaintiff to "perform water exercises as instructed". (*Id*). Plaintiff saw Dr.

Lee again on December 29, 2004, at which time the doctor observed that Maldonado "continues to

have persistent symptoms in the right hip". Dr. Lee then ordered an "aspiration"[12] of Plaintiff's hip

---

[12] An "aspiration" is "the act of withdrawing a fluid, such as mucus, or serum, from the
body of a suction device". MOSBY'S at 134.

"to rule out underlying infection".  (*Id.*).  During the next three weeks, Plaintiff underwent two successful "right hip aspiration[s]".  (Tr. at 192, 199).  The record shows that, after his second procedure, "[a]dequate hemostasis was achieved"[13].  (Tr. at 196).  However, the aspirations did not reveal the source of Plaintiff's pain, so when he returned to Dr. Lee, on January 25, 2005, the doctor ordered a bone scan.  (Tr. at 192).  On February 2, 2005, Plaintiff had a "bone scan" which showed no abnormalities.  (Tr. at 195).  Because the bone scan did not "suggest infection", Dr. Lee then noted that there was "[p]robable degenerative disc disease on the lumbar spine" and he referred Plaintiff "for [an] MRI evaluation of the lower back".  (Tr. at 192).  One month later, David J. Wolk, M.D. ("Dr. Wolk") evaluated the MRI of Plaintiff's "lumbar spine".  Dr. Wolk reported there was "[d]egenerative change of the lumbar spine" which "result[ed] in moderate spinal canal and mild bilateral neural foramen stenosis".[14]  Dr. Wolk noted that there were no herniated discs.  When Plaintiff returned to Dr. Lee, he was also diagnosed as suffering from "[d]egenerative disc disease of [the] lumbar spine with possible moderate spinal stenosis".  (Tr. at 191).  Because of that diagnosis, Dr. Lee referred Plaintiff to "Dr. John Jones, [a] local neurosurgeon", and instructed him to schedule another appointment in one month.  (*Id.*).  The record shows that, on April 8, 2005, Plaintiff failed to appear for that appointment.  (*Id.*).

---

[13] "Hemostasis" is "the termination of bleeding by mechanical or chemical means or by the complex coagulation process of the body, which consists of vasoconstriction, platelet aggregation, and thrombin and fibrin synthesis.  MOSBY'S at 750.

[14] "Foramen" is "an opening or aperture in a membranous structure or bone, such as the apical dental foramen and the cartoid foramen".  MOSBY'S at 652.
   "Stenosis" is "an abnormal condition characterized by the construction or narrowing of an opening or passageway in a body structure".  MOSBY'S at 1539.

On March 18, 2005, Maldonado did see John M. Jones, M.D., P.A. ("Dr. Jones"), a neuro surgeon. (Tr. at 189). Plaintiff complained of hip pain and "occasional back pain and groin pain on the left". (Tr. at 188). Plaintiff also reported that he uses crutches to "support himself" and that "[s]itting and standing aggravate his pain". (*Id*.). Dr. Jones noted that Plaintiff's "neurological exam is essentially normal except for" muscle spasms in his back and a "decreased range of motion of the lumbar spine". (*Id*.). From Dr. Jones' review of Plaintiff's MRI, he found that Maldonado "has lumbar spine stenosis". Dr. Jones recorded that he was "treating [Maldonado] with muscle relaxants and physical therapy". (*Id*.). Plaintiff next visited Dr. Jones on April 22, 2005. (Tr. at 187). At that visit, Dr. Jones noted that Plaintiff's "leg pain [was] less", he was "just using [a] cane", and that although "therapy initially made [his pain] worse", it was "now improved". (*Id*.). Maldonado reported "taking no pain pills", except "occ[asionally] Advil". (*Id*.). Dr. Jones recommended that he continue with physical therapy for four weeks and then return. (*Id*.). The next month, Plaintiff again saw Dr. Jones again and stated that he was "still using [a] cane". (Tr. at 185). Dr. Jones diagnosed Plaintiff with spinal "stenosis" and recommended that he have back surgery.

### *Educational Background, Work History, and Present Age*

At the time of the administrative hearing, Maldonado was 47 years old and he had a 9th grade education from Mexico. He is unable to communicate in English, so his wife translated for him at the hearing. (Tr. at 19, 214). He testified that he completed a work-sponsored "1 to 2 day training" course to become a diesel mechanic and that he previously worked as a mechanic for twenty-seven years. (Tr. at 88, 103). For the majority of that time, he "fix[ed] tractor machines", "but [the] last 3 years [he] fixed welding machines". (Tr. at 89). Maldonado wrote that his "job changed per doctors [sic] orders". (*Id*.).

*Subjective Complaints*

In his application for benefits, Plaintiff claimed that he was unable to work because of his total hip replacement and the arthritis in his "hips, knee, shoulder [and] neck". (Tr. at 97). He explained that those conditions limited his ability to work because he was "unable to walk far, bend, lift weight, climb stairs and stay in one position for too long". (*Id*.). Those activities caused him "severe pain". (*Id*.). Maldonado stated that he stopped working because he got "la[id] off due to [the] department shutting down". (*Id*.). To alleviate his pain, Plaintiff claimed that he "take[s] pain medication to relax, [and he] do[es] stretches". (Tr. at 86). Plaintiff stated that for exercise, he does "home stretches, [and] walk[s] around the house". (*Id*.).

At the hearing before the ALJ, Maldonado testified that when he was working, he "was in pain and it was getting worse everyday". (Tr. at 215). As a "diesel mechanic", Plaintiff stated that he, "[w]orked on tractors". (*Id*.). He would "climb on the tractors", and slowly "get off the tractors" and "go under" them. (*Id*.). He learned to "work on the heavy equipment" because "[t]hey gave him an opportunity when he was a sweeper to be a mechanic and from other people he learned a little bit at a time". (*Id*.).

Maldonado reported that he completed the "[n]inth grade in Mexico". (Tr. at 216). He never "went to trade school to learn how to become a diesel mechanic", instead "[h]e learned everything at the shop". (Tr. at 216). Plaintiff testified that he was "a helper when he" started, but that "he was the head [mechanic] at the end". (Tr. at 216). His last day of work was "March 6, 2003", and since then, he has not "worked at any job whether for pay or not". (*Id*.). He stopped working because "the department where he worked shut it's doors", and after that, "nobody would hire him because of his problems". (Tr. at 217). Plaintiff testified that he does not feel as though he could "continue

17

to work in a competitive work situation", because "he has trouble with English" and he "can't be
. . . sitting down or standing up for more than 30 minutes".  (Tr. at 217).  When describing each of
his physical ailments, Plaintiff explained,

> First a hip replacement.  The second part is [my] knees.  Now it's [my] other hip and
> now it's [my] back that they want to do the back surgery on.  And [my] shoulders
> and neck are getting to where [I] can't turn.

(Tr. at 217).  Plaintiff stated that, because of these ailments, "it bothers him" to stand or walk and
"he just can't be still".  (Tr. at 218).  He has to "get his crutches" to stand up.  However, he reported
that he only uses his crutches "two to three times a week" and "the rest of the time he uses his cane".
(*Id.*).  He "always uses some sort of walking device either a cane or crutches" and his "inability to
walk unassisted[] has gotten worse over time".  (Tr. at 218).  In addition, he is unable to "lift" as
well as "bend over or squat down", because of his back problems.  (Tr. at 218-19).  Plaintiff testified
that the most weight he could lift "without getting pain" was "ten pounds".  (Tr. at 219).

Plaintiff also described a series of accidents that he had.  (Tr. at 219).  At one time, he "put
the cane to the side" and his legs "gave out" and "he fell".  (Tr. at 219).  In another instance, "he fell
again" when "he tried to get up" from a chair and "he had [his] cane [to] the side".  (Tr. at 219-20).
Plaintiff testified that this occurs "frequent[ly]" whenever "he's sitting for a long [time] and he
wants to try to get up without anything".  (Tr. at 220).  Maldonado also said that, because of his
arthritis, it was painful to use "his shoulder and his neck", and in particular, "raise his arms over his
head".  (Tr. at 220).  Plaintiff testified further that "[l]ately things fall from his hand".  He
complained that he "experience[s] pain . . . in his back", which he described as a "knifing pain" and
"his neck", which he said "just gets real, real hard".  (Tr. at 221).  To relieve his back pain, he said
"[h]e has to get the weight off and lay down".  (Tr. at 221).  To alleviate his neck pain, "he just takes

medicine". (*Id.*). Plaintiff also claimed that if he stands "[i]s able to do any light housework", within an hour he has to go lay down . . . for about two hours". (Tr. at 221).

When asked whether he "[i]s able to do any light housework", he responded that "[h]e doesn't think so", but "he doesn't know". (Tr. at 221). In March 2003, before he "stopped working", he was able to work, but "[h]e had pain". At that time, "his employers . . . helped him a lot". "When he couldn't walk[,] they would let him sit down [for] an hour or two hours". (*Id.*).

The ALJ then gave Plaintiff's attorney the opportunity to ask questions of Maldonado's wife. (Tr. at 222). Plaintiff's wife, Irma Maldonado, stated that she always "go[es] with [her] husband when he goes to the doctor". (Tr. at 222). She noted that the doctors have diagnosed Plaintiff with "ankylosis [] spondylitis". (*Id.*). Ms. Maldonado then provided the following "summary" about her husband's relevant medical history:

> [H]is problems started in 83 where he would hurt and limp . . . I started taking him
> to different doctors trying to find out what the problem was. I took him to regular
> doctors, I took him to bone doctors, orthopedics, I took him to back doctors. Finally
> in 95 I saw a commercial on T.V. about the spine institute because all the other
> doctors kept saying it was a slipped disc. . . I took him to see Dr. Clyburn and Dr.
> Clyburn did some tests and right away [he said that] it's not your back it's your hip
> he has ankylosing spondylitis. He said it was hereditary. He said he could operate
> on hi[m] because at that time his  pain was so  severe he  couldn't go to the
> bathroom . . . so they did surgery on his hip . . . he's limped ever since but he was
> able to work and it seemed like as he was getting older it was getting worse. Since
> then Dr. Pegrum, that's who we were referred to by Dr. Clyburn . . . for [his]
> rheumatoid arthritis, he's been on I think that pain killer . . . anti-inflammatory drugs,
> I massage him all the time, I put heating pads [on him too]. . . . [W]ithin the last . .
> . ten years, it['s] like it['s] jump[ed] from the hip to . . . the knee and [] to his neck.
> Dr. Pegrum says it's the arthritis that [] flares up and [] jumps around. Finally I got
> upset with Dr. Pegrum because I felt like he was getting worse and he wasn't doing
> anything for him. I kept thinking he needs something else. Finally he referred him
> to Dr. Lee and . . . Dr. Lee found his hip had gone bad . . . he has arthritis in his left
> hip, found out he has spinal stenosis, and it's just worse. I thought he's out of work
> he's going to be better, he's going to be able to find something lighter but nobody
> will hire him and he's in a lot of pain and I don't know what to give him or do for
> him anymore.

(Tr. at 222-23).  Ms. Maldonado testified further that now the doctors "want to do surgery on his back because he has spinal stenosis". (Tr. at 224).  She stated that when Plaintiff's arthritis "flares up, it pinches a nerve, [and] that's when he gets the weakness in his legs because [of] the back pain". (Tr. at 224).  Ms. Maldonado stated that her husband takes pain medication and that when he does, "[h]e can't do anything, he gets real dizzy, [and] he has to be in bed". (*Id.*).  As to the particular medications that Plaintiff takes, Ms. Maldonado testified:

> He takes Darvocet, he takes Skelaxin, Ultram, I give him anything with pain, we substitute, when he's real dizzy with the pain medication, muscle relaxers I'll stop that for a little while, I've given him Advil, I've given him Tylenol Arthritis so that, that doesn't make him dizzy so he can at least get up.

(Tr. at 224).  She claimed that there were also "bad days" when Plaintiff "can't function at all". (Tr. 224).  On those days, Ms. Maldonado has "had to help him to go to the bathroom" and "bring something to the bed because he can't get up". (*Id.*).  She explained that these "bad days" occurred "often", about "three days out of a week", but "more during the cold weather". (Tr. at 225).  Later, she testified that these bad days came "at least one or two days out of the week, [so] . . . about seven to eight days out of a month". (Tr. at 226).  Finally, Plaintiff's wife testified that, when it is not a "bad day", he usually has to lay down "at least twice" during the day "to relieve his pain".

### *Expert Testimony*

The ALJ also heard testimony from Karen Nielsen, Ph.D. ("Dr. Nielsen"), a vocational expert witness. (Tr. at 226).  From her review of the record, as well as from the hearing testimony, Dr. Nielsen described Maldonado's prior work experience as a "diesel mechanic" as "heavy and skilled", according to the "Dictionary of Occupational Titles". (Tr. at 226-27).  The ALJ then asked Dr. Nielsen whether a person of Plaintiff's "age, education and past work experience", could "do his past relevant work" if "he has to alternate between sitting and standing at will", "lift no more

20

than ten pounds," perform at the "sedentary level," and is "restrict[ed] [to] no repetitive overhead

reaching, [and] no foot controls".  (Tr. at 227).  Dr. Nielsen responded that he could not.  She also

testified that Plaintiff had no "skills that would transfer to the sedentary level".  (Tr. at 227).  Dr.

Nielsen then named four "unskilled" and "sedentary" positions which Plaintiff could perform.  (*Id*.).

Those were a "laminating clerk", a "table worker", a "charge account clerk", or an "assembly clerk".

(*Id*.).  On the "charge account clerk" position, Dr. Nielsen added that "you don't have to read . . .

it's basically sorting". (*Id*.).   She explained further that a "laminating clerk . . . just laminat[es]

materials".  (*Id*.).  Dr. Nielsen then testified that

> there are 600 plus of each one of those [jobs] and a combination nationwide of
> 305,000 and that's a representative sample of the sedentary unskilled to meet that
> hypothesis with the sit/stand option.

(Tr. at 227).  The ALJ told Dr. Nielsen to take into account Plaintiff's "severe pain" which

reportedly causes him "to lay down approximately two hours out of the ordinary work day".  (Tr.

at 227).  Dr. Nielsen testified that such a limitation "would eliminate all competitive employment".

(Tr. at 228).  Plaintiff's counsel then asked Dr. Nielsen to "[a]ssume an individual with the original

hypothetical", but to "subtract the severe" limitation. (Tr. at 228).  The attorney then asked Dr.

Nielsen about the "employability" of such an individual who "would have to miss more than three

days a month on a regular basis".  Dr. Nielsen replied that such a requirement would also "eliminate

competitive employment".  (Tr. at 228).  The following exchange then occurred between Plaintiff's

attorney and Dr. Nielsen:

> ATTY:      Okay.  How does the language barrier, inability to speak or
>            communicate in English affect unskilled sedentary?
> VE:        The unskilled sedentary i[s] say about, approximately 20% and that,
>            but they don't break it down across the board, sedentary, light and
>            medium in other words there's, there's labor jobs, assembly jobs.

(*Id*.).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Maldonado suffered from the "severe" impairments of "hypertension, status post right hip replacement, spinal stenosis, bilateral osteoarthritis of the knees, and obesity". (Tr. at 20).  The ALJ found that Plaintiff's "allegations regarding his limitation are not totally credible".  (Tr. at 27).  He concluded further that Maldonado has the "residual functional capacity to perform a sedentary level of work activities", at the "unskilled" level.  (Tr. at 27).  In particular, the ALJ found that Plaintiff could

> lift/carry no more than 10 pounds occasionally and 5 pounds frequently, stand/walk for no more than 2 hours in an 8 hour workday, and sit approximately 6 hours in an 8 hour workday, compromised by the need to alternate with sitting/standing at will in an 8 hour workday, and while performing at that level of exertion would be precluded from repetitive overhead reaching and using foot controls.

(Tr. at 27).  The ALJ found that Maldonado was "unable to perform any of his past relevant work" and that he had "no transferable skills from [the] skilled work he previously performed".  (Tr. at 27).  He determined that, "[b]ased on the vocational expert and using Medical-Vocational Rule 201.19 as a framework for decision-making, jobs that the claimant was able to perform existed in significant numbers in the national economy".  (Tr. at 27).  With those findings, the ALJ concluded that Plaintiff "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision".  (Tr. at 27).  For that reason, he denied Maldonado's application for disability benefits, which prompted his request for judicial review.

In his appeal, Plaintiff argues that the ALJ erred in finding that Plaintiff's impairments do not meet the requirements of "Listing § 1.02", which addresses "Major Dysfunction of a Joint".

(Plaintiff's Motion at 9).  Maldonado also complains that the ALJ "dismissed Plaintiff's complaints regarding his joint pain and resulting instability" by relying, improperly, on the notes of Dr. Pegram's nurse, as well as Dr. Gibson, who was not Maldonado's treating physician.  (*Id*. at 12-14).  For those reasons, he claims that his residual functional capacity assessment at the sedentary level is not proper.  (*Id*. at 15).  Maldonado also argues that "[a] directed verdict of disabled was warranted" under Medical-Vocational Rule 201.17.  (*Id*. at 16).  Finally, Plaintiff complains that the positions of "table worker" and "assembler" are not "sedentary occupation[s]" because they require "medium" and "light" levels of exertion.  (Plaintiff's Response at 3).  In response, Defendant insists that "[s]ubstantial evidence supports the ALJ's decision that Plaintiff can perform unskilled, sedentary work as a laminator, table worker, and assembly clerk".  (Defendant's Motion at 3).  The Commissioner contends that "Plaintiff has failed to satisfy his burden of proof that his impairments meet or equal Listing 102A for major dysfunction of a joint".  (Defendant's Response at 2).  Defendant argues further that "[t]he ALJ was not able to use the Medical-Vocational Rules (grids) because Plaintiff had non-exertional limitations such as needing to alternate between sitting and standing at will".  (*Id*. at 6).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).  "If the Commissioner's findings are supported by substantial evidence,

they must be affirmed." *Id.* (citing *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995)). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).

In making his findings, the ALJ relied on the reports from Drs. Pegram, Gibson, Lee, and Samaratunga, as well as the claimant's own testimony.  (Tr. at 20-26).  He first discussed Dr. Pegram's treatment notes.  (Tr. at 20).  The ALJ observed that in March 2002, Plaintiff "presented to Dr. Samuel Pegram with complaints of acute pain involving his right hip and knee", but that by October 2002, Maldonado "reported that his right hip was much more improved following pain medication therapy" and "he complained of only occasional popping of the right knee".  (*Id.*).  The ALJ also acknowledged that, in January 2003, the claimant claimed to experience "mild" neck pain, but stated that "his other joints were stable".  (Tr. at 20).  He recognized Dr. Pegram's diagnoses of "spondyloarthropathy and cervicalgia".  However, he also observed that, in April and November of 2003, when Plaintiff "sought follow up treatment for ongoing" neck and hip pain, he "reported being out of . . . medication therapy".  (Tr. at 20).

The ALJ also observed many of the findings from Dr. Gibson's "consultative examination" of Maldonado.  (Tr. at 20).  He noted that, in March 2004, Dr. Gibson found Plaintiff "to be neurologically intact without motor or sensory deficits".  (Tr. at 20).  The ALJ recognized that, "[a]lthough the claimant reported [a] history of back, neck, right hip and chronic joint pain", Dr. Gibson found that Plaintiff's back "was non-tender with forward flexion of 90 degrees".  In addition, Dr. Gibson determined that Maldonado "exhibited good fine and gross motor coordination and he

was able to sit, stand and walk . . . without assistance". (Tr. at 20).  The ALJ noted Dr. Gibson's

interpretations of Plaintiff's x-rays, as well.  Dr. Gibson stated that the x-ray of Plaintiff's knee

"showed a normal patella femoral joint without evidence of fractures, dislocations or degenerative

changes". (Tr. at 20).  There was also an x-ray of Plaintiff "cervical spine" which "revealed normal

alignment with mild degenerative changes and without any evidence of fractures or dislocations".

(*Id*).  The ALJ pointed further to Dr. Gibson's findings following his examination of Maldonado.

 The ALJ's summary is set out below:

> Dr. Gibson's examination of the claimant's extremities showed normal internal and
> external rotation of the right hip. [Plaintiff] was also able to perform full extension
> and flexion of 120 degrees of the knees. H[e] exhibited good range of motion of the
> shoulders as well.  The claimant also reported that he is able to perform light
> housework and drive a motor vehicle.

(Tr. at 21).

The ALJ further discussed Plaintiff's visits to Dr. Lee.  He noted that, "from October 5, 2004

through February 7, 2005 . . . the claimant complained of ongoing pain involving his right hip

aggravated by weight bearing". (Tr. at 21).  However, he remarked upon Dr. Lee's findings that

Plaintiff's "total body scan showed no abnormalities" and the MRI of his spine "showed

degenerative changes resulting in only moderate spinal canal and mild bilateral neural foramen

stenosis . . . without focal lumbar disc herniation". (Tr. at 21).  Further, when Plaintiff saw Dr. Lee,

in April 2005, "he reported that he was much improved following physical therapy" and that he had

"decreased leg pain". (Tr. at 21).  At that time, "[h]e also denied undergoing any pain medication

therapy". (Tr. at  21).  The ALJ observed that Dr. Lee recommended that Plaintiff undergo back

surgery, "which he has not done".[15]

---

[15]   The ALJ also noted that "the claimant suffers from obesity", which "is a medically
determinable impairment that is often associated with disturbance of the musculoskeletal system,

To further support his decision that Plaintiff is capable of sedentary work, the ALJ relied upon the physical residual functional capacity assessment completed by Dr. Samartunga, the state agency physician. (Tr. at 22). The ALJ noted that,

> Dr. Samartunga concluded that the claimant could lift and carry 50 pounds occasionally and 25 pounds frequently, stand/walk about 6 hours in an 8 hour workday, and sit about 6 hours in an 8 hour workday with some restrictions.

(*Id*.). From this evidence, the ALJ found that, "based solely on the objective medical evidence of record, it appears that the claimant retains the residual functional capacity for medium work". (*Id*.). Nevertheless, the ALJ concluded that, "based on the record as a whole", the claimant retains the residual functional capacity to perform a sedentary level of work". (Tr. at 22).

In reaching that conclusion, the ALJ rejected the claimant's testimony as "not fully support[ed]" by the record and "compromised by a number of inconsistencies". (Tr. at 23). He noted that Plaintiff "testified he was unable to work due to chronic back pain and right hip pain". (Tr. at 23). However, he reiterated Dr. Gibson's findings that Plaintiff "exhibited good fine and gross motor coordination"; that he "was able to sit, stand and walk . . . without assistance"; that he "improved following physical therapy"; and that he "denied undergoing any medication therapy". (Tr. at 23). Those findings also caused the ALJ to discredit Plaintiff's testimony that he "has to lie down two hours twice a day" because of "constant chronic pain". (Tr. at 24). The ALJ recognized that Plaintiff's "allegation of hypertension [was] well documented in the medical record", but noted that "a follow up visit in January 2003 indicates that the claimant's blood pressure rate was normal". (Tr. at 23). The ALJ observed that "surgery has been recommended for repair of the claimant's back

---

and disturbance of this system can be a major cause of disability in individuals with obesity". (Tr. at 21). For that reason, the ALJ decided that "consideration must be given to any additional and cumulative effects of obesity". (Tr. at 21).

impairment" and any "medical condition that can reasonably be remedied by surgery, treatment, or medication is not disabling". (Tr. at 24). Further, the ALJ noted that the medical record "reflects that the claimant suffers from morbid obesity". (Tr. at 24). On that point, the ALJ emphasized that,

> the record does not document any significant attempt to decrease his weight nor evidence indicating that he has enrolled in an exercise or diet class nor in a healthy eating class to promote weight reduction, education, and understanding of various food regiments in an effort to control his diet. . . . the claimant's failure to lose weight could suggest a lack of motivation to be well in order to return to work.

(Tr. at 24).

In addition, the ALJ found it "significant that no physician has indicated that the claimant is unable to work". (Tr. at 24). He pointed out that "none of [Plaintiff's] treating or examining physicians . . . [determined] that he is disabled by any of his impairments during the relevant period or has limitations greater than those determined in this decision". (Tr. at 24). In addition, the state agency physician, Dr. Samartunga, concluded that Plaintiff's "impairments are not disabling" which the ALJ noted was "consistent with the medical record". He described the medical record as showing "frequent outpatient records of subjective complaints, but little objective evidence to substantiate the claimant's allegations". (Tr. at 24).

The ALJ also noted that "the claimant's activities are consistent with an ability to perform sedentary work". (Tr. at 25). He mentioned Plaintiff's testimony that he could "lift/carry up to 10 pounds" and he observed that "the claimant reported that during an average day, he attends to his son's [sic] personal care such as taking them to and from school". (Tr. at 25). Plaintiff "also acknowledged that he is able to perform household chores such as cleaning and grocery shopping". (Tr. at 25). The ALJ determined that, "[t]hese comments are inconsistent with an allegation of total disability". (*Id.*). Finally, the ALJ remarked that,

27

> While [there is] no doubt the claimant has some pain and discomfort associated with his condition, such symptoms are found to be mild to moderate at most.  It is well settled, as a matter of law, that the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of total disability.

(*Id.*).

The ALJ then discussed the testimony from vocational expert, Dr. Karen Nielsen, who "testified the claimant's past work as a diesel mechanic was heavy and skilled".  Based on that determination, the ALJ concluded that Plaintiff "cannot perform his past relevant work", and so,

> the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with his residual functional capacity, age education and work experience.

(Tr. at 25).  The ALJ then summarized Dr. Nielsen's testimony that,

> an individual with the claimant's age, education, and past work experience, and who has the residual functional capacity to perform work at the sedentary level of exertion . . . to lift/carry no more than 10 pounds occasionally and 5 pounds frequently, stand/walk for no more than 2 hours in an 8 hour workday, and sit approximately 6 hours in an 8 hour workday, compromised by the need to alternate with sitting/standing at will in an 8 hour workday, and while performing at that level of exertion would be precluded from repetitive overhead reaching and using foot controls . . . could perform sedentary unskilled jobs such as a laminator I, table worker and assembly clerk, of which there are each 600 locally and combination of 305,000 nationally, numbers that the undersigned finds to be significant.

(Tr. at 26).  Based on these findings, the ALJ denied Plaintiff's application for benefits.  (Tr. at 26).

Plaintiff first argues that the ALJ erred by finding that his impairments did not meet "the requirements of Listing §102".  (Plaintiff's Motion at 9).  That listing provides the following:

> 1.02 Major Dysfunction of a joint(s) (due to any cause):Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.    Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b);

20 C.F.R. pt. 404, Subt. P, app. 1, Listing 1.02.  Under this listing, "ineffective ambulation" is described as:

the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id*. at § 1.00(B)(2)(b).  To prove that an impairment meets this listing, a plaintiff must show that he satisfies all of the named criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (holding that "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify".).

Plaintiff argues that because he has

undergone a total right hip replacement and *additionally*  . . . suffers from osteoarthritis affecting both of his knees, ankylosis, *and* degenerative changes to his left hip . . . his major joint dysfunction  cannot be characterized merely by "Involvement of one major peripheral weight bearing joint . . ." but by involvement of *four major weight bearing joints*.

(Plaintiff's Motion at 9) (emphasis in original).  Plaintiff contends further that he has "demonstrated an inability to ambulate effectively" because he "requires the use of two crutches".  (*Id*. at 10). Defendant, however, is adamant that "Plaintiff does not satisfy Listing 1.02A because he can ambulate effectively".  (Defendant's Response at 2).  The Commissioner insists that substantial evidence supports the ALJ's finding on that point.  (*Id*. at 3).

It is true that Dr. Lee ordered Plaintiff to use "crutches for ambulatory assistance".  (Tr. at 193).  However, the treating notes disclose that when Plaintiff returned to Dr. Lee the next month, he "walk[ed] on a cane despite previous instruction to utilize crutches".  (Tr. at 192).  In addition,

29

even though Plaintiff testified that he has to "get his crutches" to stand up, he also admitted that he only uses his crutches "two to three times a week" and "the rest of the time he uses his cane". (Tr. at 218). Further, Dr. Pegram never ordered Plaintiff to use crutches and Dr. Gibson's consultative exam revealed that Plaintiff could "sit, stand, and walk . . . without assistance". (Tr. at 115-57, 160). Dr. Samartunga, the state agency physician, also wrote that "claimant was able to sit, stand, [and] walk in the office w/o assistance". (Tr. at 169). Based on the record as a whole, substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 1.02.

Plaintiff next complains that the ALJ failed to account for his degree of pain in finding that he maintained the residual functional capacity to perform at the sedentary level. (Plaintiff's Motion at 10-15). He argues that "the ALJ dismissed [his] complaints regarding his joint pain and resulting instability and relied upon inconsistent and non-controlling evidence to support his finding". (Tr. at 11). Among the "non-controlling" evidence Plaintiff points to, is a note from Dr. Pegram's office. In the note, which Dr. Pegram's nurse signed, it is recorded that, the patient "[s]tates pain in right hip has improved". (Tr. at 126). Plaintiff claims that when the ALJ cited this particular record in his opinion, he noted that Plaintiff's hip pain "was much more improved following pain medication therapy". (Plaintiff's Motion at 11). Plaintiff describes that interpretation as a "material misstatement of the record". (*Id*.). In addition, Plaintiff complains about the ALJ's reliance on Dr. Gibson's opinion because he "was not a treating physician and only performed a consultative examination of Plaintiff". (*Id*. at 12). In response, Defendant contends that "[s]ubstantial evidence supports the ALJ's RFC finding that Plaintiff can perform sedentary work". (Defendant's Response at 4). The Commissioner also points out "that pain is disabling only when it is 'constant,

unremitting, and wholly unresponsive to therapeutic treatment'". (*Id*.). Defendant argues that Plaintiff "fails to prove pain to this degree". (*Id*.).

In reviewing the ALJ's opinion, it appears that he acknowledged the opinions from not only Dr. Gibson, but also from Drs. Pegram, Lee, Jones and Sarmartunga. The ALJ noted that, in March 2002, Plaintiff "presented to Dr. Samuel Pegram with complaints of acute pain involving his right hip and knee". (Tr. at 21). However, by October 2002, Maldonado claimed that the pain in his right hip was "improved". (Tr. at 126). By January 2003, the ALJ noted that Plaintiff claimed to experienced only "mild" neck pain, and stated that "his other joints were stable". (Tr. at 20). The ALJ did acknowledge that, during Plaintiff's visits with Dr. Lee, he "complained of ongoing pain involving his right hip aggravated by weight bearing". (Tr. at 21). But, he also noted that, in April 2005, Maldonado "reported that he was much improved following physical therapy" and that he had "decreased leg pain". (Tr. at 21). It is true that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight", but "the ALJ has the sole responsibility for determining the claimant's disability status". *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 1990). The Fifth Circuit has declared that, "[t]he treating physician's opinions are not conclusive . . . . [and] opinions may be assigned little or no weight when good cause is shown". *Id*. Here, however, there is no need to decide whether good cause exists to disregard the treating physicians' opinions, because there is ample record evidence from both treating and examining physicians to support the ALJ's findings on Plaintiff's pain. Moreover, the ALJ relied on the Plaintiff's own account of his daily activities, which showed that he was able to tend to the needs of his two children. It is well-settled that an ALJ may consider such evidence in determining whether a claimant is disabled. *See Reyes v. Sullivan*, 915 F.2d 151, 154-55 (5th Cir. 1990) (citing

*Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988).  This evidence supports the ALJ's finding that Plaintiff is capable of performing sedentary work, and so, Maldonado's motion for summary judgment, on this ground, should be denied.

Plaintiff next argues that "a directed verdict of disabled was warranted prior to considering whether or not Plaintiff could perform other jobs, in light of Grid Rule 201.17".  (Plaintiff's Motion at 16).  Defendant, on the other hand, insists that the "ALJ was not able to use the Medical-Vocational Rules because Plaintiff had non-exertional limitations such as needing to alternate between sitting and standing at will".  (Defendant's Response at 6).  Indeed, the Fifth Circuit has held that,

> [T]he Secretary may rely on the medical-vocational guidelines to establish that work exists for a claimant only if the guidelines' 'evidentiary underpinnings coincide exactly with the evidence of disability appearing on the record'. . . . In cases of unusual limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the implications for the occupational base.

*Scott v. Shalala*, 30 F.3d 33, 34-35 (5th Cir. 1994).  Here, Plaintiff had the "unusual limitations" of "alternat[ing] . . . sitting/standing at will . . . [and was] precluded from repetitive overhead reaching and using foot controls."  For that reason, it was appropriate for the ALJ to rely on the testimony from Dr. Nielsen rather than the Medical-Vocational guidelines.

Finally, Plaintiff argues that although the ALJ relied on Dr. Nielsen's testimony that Plaintiff could perform the jobs of a "laminator", a "table worker" and an "assembly worker", it is only the "laminator" occupation that is classified as "sedentary and unskilled" in the Dictionary of Occupational Titles.  (Plaintiff's Response at 3).  Maldonado complains that the "table worker" position "requires a *medium* exertional capacity".  (*Id*. at 4) (emphasis in original).  In addition, he points out that the "assembler" occupation is "performed at the light level".  (*Id*.).  For these reasons,

Maldonado argues that the vocational expert witness' testimony was flawed, and so, the ALJ erred in relying on it to find that he is not disabled.  The Commissioner does not address this argument, although he points out, correctly, that a vocational expert witness' testimony is often times more relevant than the DOT.  (*Id.*) (citing *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

Because the ALJ found, at step four of the analysis, that Maldonado has no past relevant work and no transferable skills, the burden shifted to the Commissioner to show that Plaintiff has the "residual functional capacity," given his age, education, and past work experience, to perform some work that is available in the national economy.  20 C.F.R. § 404.1520(f); *Leggett*, 67 F.3d at 565 n.11; *Fraga*, 810 F.2d at 1304.  It is well-settled that the Commissioner can meet that burden by relying on testimony, from a vocational expert witness, that jobs appropriate for the claimant exist.  *See Leggett*, 67 F.3d at 565; *Morris v. Bowen*, 864 F.2d 333, 335-36 (5th Cir. 1988).  The Fifth Circuit has observed frequently that "[t]he value of a vocational expert [witness] is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed."  *Carey v. Apfel*, 230 F.3d 121, 143-44 (5th Cir. 2000); *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). Further, the court "has recognized that the DOT is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job."  *Carey*, 230 F.3d at 145 (citing *Fields*, 805 F.2d at 1171).  If . . . the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert witness to establish that such jobs exist in the economy."  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *see also Fraga*, 810 F.2d at 1304.

In fact, in *Carey v. Apfel*, the Fifth Circuit addressed "whether an ALJ may rely upon the testimony of a vocational expert [witness] when that expert's testimony is either in conflict with or creates a conflict in the evidence in light of DOT provisions." 230 F.3d at 143-44. In *Carey*, as here, there was an alleged conflict between the vocational expert witness' testimony that the claimant could perform certain jobs, and the DOT description of those jobs *See* 230 F.3d at 143-44. The claimant in *Carey* had only one arm. *Id*. at 143. The ALJ posed a hypothetical question to the vocational expert witness, which included all of the limitations that Carey identified, and which were supported by the objective medical evidence. *Id*. at 145. Based on the hypothetical question, the vocational expert witness determined that Carey retained the residual functional capacity to perform light, unskilled work, and that he could work as a ticket taker or cashier. *Id*. Carey challenged the ALJ's determination that he was not disabled, noting that those jobs were described in the DOT as requiring "some ability to finger and handle things." *Id*. at 146. On appeal, the Fifth Circuit found it noteworthy that "Carey's counsel was given an opportunity to object or cross-examine the vocational expert [witness] on the [e]ffect of Carey's amputation on his ability to perform the identified jobs," but did not do so. *Id*. The court held that,

> claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Id*. at 146-47. The court then concluded that, "to the extent that there is any implied or indirect conflict between the vocational expert [witness'] testimony and the DOT . . . the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Id*. at 146.

Here, the ALJ found, based on Plaintiff's subjective complaints and the objective medical evidence, that Plaintiff suffers from exertional and nonexertional impairments.  For that reason, it was appropriate for him to rely on a vocational expert witness to establish whether any jobs exist in the local and national economy that Maldonado is capable of performing.  *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  It is true that a conflict exists between the vocational expert witness' testimony, that work as a "table worker" and "assembler" is "sedentary" work, and the DOT's description of those jobs as "medium" and "light" work, respectively.  Given that direct conflict, the ALJ may not rely on that portion of Dr. Nielsen's testimony to find that Maldonado is not disabled.  But Dr. Nielsen also described another job which is consistent with the ALJ's determination of Plaintiff's residual functional capacity, and which did not conflict with information contained in the DOT.  For that reason, her answer "nonetheless provided the ALJ with evidence substantial enough to support a determination that employment was available" to Maldonado.  *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). As the Fifth Circuit has explained,

> The ALJ could rely on portions of the expert's answer without endorsing all of the expert's conclusions.  The ALJ's failure to expressly restrict his use of the expert's testimony may at most reflect a minor procedural impropriety.  We do not now reach that question, because, even if such an impropriety exists, it does not render the ALJ's determination unsupported by substantial evidence, and thus does not prejudice [the claimant's] substantive rights.

*Id.*  Further, there is no apparent conflict between Dr. Nielsen's testimony that Plaintiff is able to work as a "laminator" and the DOT description of that job.  Even if such an indirect conflict may exist, the court concludes that the record reflects adequate support for Dr. Nielsen's opinion that Plaintiff is capable of performing that occupation.  For that reason, the ALJ did not err in relying upon that testimony to conclude that Plaintiff is capable of work that is available in significant

numbers in the national economy.  *See Carey v. Apfel*, 230 F.3d 121, 146-47 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).  On this record, it is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED, and Defendant's motion be GRANTED.

**Conclusion**

It is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and that Defendant's motion be GRANTED.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, room 9513, and to the chambers of the undersigned, Room 7007.

SIGNED at Houston, Texas, this 14th day of February, 2008.

                        MARY MILLOY
            UNITED STATES MAGISTRATE JUDGE